UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| | | |
|---|---|---|
| GOLDMAN, SACHS & CO., | ) | |
|         Plaintiff, | ) | |
| | ) | 3:12-cv-00327-RCJ-WGC |
| vs. | ) | |
| | ) | |
| CITY OF RENO, | ) | **ORDER** |
| | ) | |
|         Defendant. | ) | |

This case arises out of the City of Reno's issuance of approximately $210 million of complex securities soon before the real estate and stock market crash of 2008 in order to fund various projects. The City has brought an action against Goldman, Sachs & Co. ("GS") before the Financial Industry Regulatory Authority ("FINRA"). Pending before the Court is GS's motion for a preliminary injunction against that action. For the reasons given herein, the Court denies the motion.

I.    **FACTS AND PROCEDURAL HISTORY**

In 2005, the City issued approximately $73 million in auction rate securities ("ARS"), in order to fund various projects, to be underwritten and brokered by GS pursuant to an October 19, 2005 agreement (the "2005 Underwriter Agreement") and an October 26, 2005 agreement (the "2005 Broker–Dealer Agreement"). (Compl ¶¶ 12–13, June 18, 2012, ECF No. 1). In 2006, the City issued approximately $137 million in ARS for similar purposes and again to be underwritten

and brokered by GS pursuant to similar agreements (the "2006 Underwriter Agreement" and "2006 Broker–Dealer Agreement"). (Compl ¶¶ 18–20).  The Broker–Dealer Agreements contain forum selection clauses to the effect that "all actions and proceedings arising out of this Broker–Dealer Agreement or any of the transactions contemplated hereby shall be brought in the United States District Court for the District of Nevada . . ." (*See* 2005 Broker–Dealer Agreement § 5.09, at 14, ECF No. 1-6; 2006 Broker–Dealer Agreement § 5.09, at 14, ECF No. 1-7).  The Broker–Dealer Agreements also contain merger and integration clauses to the effect that "the [Broker–Dealer Agreement] and the other agreements and instruments executed and delivered in connection with the issuance of the ARS, contain the entire agreement between the parties relating to the subject matter hereof, and there are no other representations." (*See* 2005 Broker–Dealer Agreement § 5.04, at 13, ECF No. 1-6; 2006 Broker–Dealer Agreement § 5.04, at 13, ECF No. 1-7).  Neither Broker–Dealer Agreement contains an arbitration clause.  Neither Underwriter Agreement contains either a forum selection clause or an arbitration clause.

On February 10, 2012, the City filed a claim against GS with FINRA, alleging wrongdoing with respect to the 2005 and 2006 agreements. (Compl. ¶¶ 27–29).  GS sued the City in this Court, asking the Court to declare that FINRA is an inappropriate forum for the claims in light of the mandatory forum selection clauses in the Broker–Dealer Agreements and the lack of any arbitration clauses in either the Broker–Dealer Agreements or the Underwriter Agreements.  GS has asked the Court for a preliminary injunction against the FINRA proceedings.

## II.     LEGAL STANDARDS

The Court of Appeals in the past set forth two separate sets of criteria for determining whether to grant preliminary injunctive relief:

> Under the traditional test, a plaintiff must show: (1) a strong likelihood of success on the merits, (2) the possibility of irreparable injury to plaintiff if preliminary relief is not granted, (3) a balance of hardships favoring the plaintiff, and (4) advancement of the public interest (in certain cases).  The alternative test requires that a plaintiff demonstrate either a combination of probable success on the merits

and the possibility of irreparable injury or that serious questions are raised and the balance of hardships tips sharply in his favor.

*Taylor v. Westly*, 488 F.3d 1197, 1200 (9th Cir. 2007).  "These two formulations represent two points on a sliding scale in which the required degree of irreparable harm increases as the probability of success decreases." *Id.*

The Supreme Court recently reiterated, however, that a plaintiff seeking an injunction must demonstrate that irreparable harm is "likely," not just possible. *Winter v. NRDC*, 555 U.S. 7, 19–22 (2008) (rejecting the Ninth Circuit's alternative "sliding scale" test).  The Court of Appeals has explicitly recognized that its "possibility" test was "definitively refuted" in *Winter*, and that "[t]he proper legal standard for preliminary injunctive relief requires a party to demonstrate 'that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest.'" *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1127 (9th Cir. 2009) (quoting *Winter*, 555 U.S. at 20) (reversing a district court's use of the Ninth Circuit's pre-*Winter*, "sliding-scale" standard and remanding for application of the proper standard).

The Court of Appeals later parsed the language of *Winter* and subsequent appellate rulings and determined that the sliding scale test remains viable when there is a lesser showing of likelihood of success on the merits amounting to "serious questions," but not when there is a lesser showing of likelihood of irreparable harm. *See Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134 (9th Cir. 2011).  This case presents some difficulty in light of *Winter* and prior Ninth Circuit cases.  To the extent *Cottrell*'s interpretation of *Winter* is inconsistent with *Selecky*, *Selecky* controls. *Miller v. Gammie*, 335 F.3d 889, 899 (9th Cir. 2003) (en banc) (holding that, in the absence of an intervening Supreme Court decision, only the en banc court may overrule a decision by a three-judge panel).  In any case, the Supreme Court stated in *Winter* that "[a] plaintiff seeking a preliminary injunction must establish that he is *likely* to succeed on

1  the merits, that he is *likely* to suffer irreparable harm in the absence of preliminary relief, that the
2  balance of equities tips in his favor, *and* that an injunction is in the public interest." *Winter*, 555
3  U.S. at 20 (citing *Munaf v. Geren*, 128 S. Ct. 2207, 2218–19 (2008); *Amoco Prod. Co. v.*
4  *Gambell*, 480 U.S. 531, 542 (1987); *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 311–12
5  (1982)) (emphases added).  The test is presented as a four-part conjunctive test, not as a four-
6  factor balancing test, and the word "likely" modifies the success-on-the-merits prong in exactly
7  the same way it separately modifies the irreparable-harm prong.  In rejecting the sliding-scale test
8  as to the irreparable-harm prong, the *Winter* Court emphasized the fact that the word "likely"
9  modifies the irreparable-injury prong. *See id.* at 22.  The word "likely" also modifies the success-
10 on-the-merits prong. *See id.* at 20.

11       In summary, to satisfy *Winter*, a movant must show that he is "likely" to succeed on the
12 merits.  "Likely" means "having a high probability of occurring or being true." Merriam–Webster
13 Dictionary, http://www.merriam-webster.com/dictionary/likely.  This colloquial, lay definition of
14 "likely" seems too stringent.  Though it could be read consistently with the *Winter* language,
15 Merriam–Webster's definition of "likely" would appear to require a showing corresponding to
16 the clear-and-convincing evidence standard, because something with a "*high* probability" of
17 being true has more than a mere greater-than-not chance of being true.  Black's Law Dictionary,
18 a more contextual reference work, defines the "likelihood-of-success-on-the-merits test" more
19 leniently as "[t]he rule that a litigant who seeks [preliminary relief] must show a reasonable
20 probability of success . . . ." *Black's Law Dictionary* 1012 (9th ed. 2009).  The Court must
21 reconcile the cases by interpreting the *Cottrell* "serious questions" requirement to be in harmony
22 with the *Winter*/*Selecky* "likelihood" standard, not as being in competition with it.  "Serious
23 questions going to the merits" must mean that there is at least a reasonable probability of success
24 on the merits.  Taken in a vacuum, "serious questions" appears to focus on the gravity of the
25 issues, but appears silent on the probability of the truth of the proffered proposition, which is the

focus of the success-on-the-merits prong. The gravity of the issues is separately considered under the balance-of-hardships prong. The *Cottrell* Court must have meant something like "reasonable probability," which appears to be the most lenient position on the sliding scale that can satisfy the requirement that success on the merits be "likely." If success on the merits is merely possible, but not reasonably probable, no set of circumstances with respect to the other prongs will justify preliminary relief.

### III.   ANALYSIS

The Second Circuit recently decided a similar case. *See UBS Financial Services, Inc. v. W. Va. Univ. Hosps., Inc.*, 660 F.3d 643 (2d Cir. 2011). There, UBS argued that arbitration was not required either under the relevant contracts or under the FINRA Rules because the defendant was not a "customer" of UBS. *See id.* at 648. UBS also argued that even if arbitration were required, the contractual forum selection clause between it and the defendant would be superior to the FINRA rules with respect to the location of arbitration. *See id.* at 654. The *UBS* court first determined that the defendant was UBS's "customer" under FINRA Rule 12200. That rule provides:

> Parties must arbitrate a dispute under the Code if:
>
> Arbitration under the Code is either:
>
> > (1) Required by a written agreement, or
> > (2) Requested by the customer;
>
> The dispute is between a customer and a member or associated person of a member; and
>
> The dispute arises in connection with the business activities of the member or the associated person, except disputes involving the insurance business activities of a member that is also an insurance company.

FINRA Code, Rule 12200, *available at* http://finra.complinet.com/en/display/display_viewall.html?rbid=2403&element_id=607&record_id=609; *see UBS Fin. Servs, Inc.*, 660 F.3d at 649 (quoting *id.*). After examining regulatory and dictionary definitions, the *UBS*

court determined that "customer" under FINRA Rule 12200 included "at least a non-broker or non-dealer who purchases, or undertakes to purchase, a good or service from a FINRA member." *UBS Fin. Servs, Inc.*, 660 F.3d at 649–50. The district court had relied on a Third Circuit case ruling that a FINRA member who underwrites securities issued by another party has that party as a "customer" under FINRA Rule 12200. *See id.* at 650; *see also UBS Fin. Servs., Inc. v. W. Va. univ. Hosps., Inc.*, 760 F. Supp. 2d 373, 378 (S.D.N.Y. 2011) (citing *Patten Secs. Corp. v. Diamond Greyhound & Genetics, Inc.*, 819 F.2d 400 (3d Cir. 1987)). The court determined that it did not need to resolve whether an issuer of securities (such as the City of Reno) was necessarily a "customer" of its underwriter (such as GS) under FINRA Rule 12200, nor whether, as the dissent urged, it could never be, *see UBS Fin. Servs., Inc.*, 660 F.3d at 650 & n.4, because in the case before it, the broker–dealer agreement provided for a fee from the issuer to the underwriter in exchange for services in facilitating the auctions at which the bonds were resold. *See id.* at 650. "In view of that undertaking and a definition of customer that at least includes an entity that undertakes to purchase a good or service, [the defendant] became UBS's customer under Rule 12200 by contracting with UBS to obtain auction services for a fee." *Id.*

In the present case, the Broker–Dealer Agreements also provide for the City to pay fees in exchange for GS's services in facilitating auctions of the securities the City issued. Therefore, *UBS* is on point, and the City is a customer entitled to arbitration under FINRA Rule 12200. (*See* 2005 Broker–Dealer Agreement § 2.05, at 6–8, ECF No. 1-6; 2006 Broker–Dealer Agreement § 2.05, at 6–8, ECF No. 1-7).

GS does not argue that FINRA Rule 12200 does not independently require arbitration. GS argues rather that the City is not a "customer" under FINRA Rule 12200 for two reasons: (1) because the ARS are municipal securities, the rules of the Municipal Securities Rulemaking Board ("MSRB") control, not the FINRA Rules; and (2) the City is not a "customer" under FINRA Rule 12200, even if that rule applies.

It is clear that there is no arbitration agreement in the relevant contracts here. Nor is there any express waiver of arbitration. The exclusive forum selection clauses in the Broker–Dealer Agreements do not touch upon arbitration or arbitrability directly, but rather only control the forum of a court action apart from, or in review of, arbitration. The Court therefore rejects the argument that the forum selection clauses prevent arbitration if arbitration is otherwise required. FINRA Rule 12200, as interpreted by the Second Circuit's persuasive opinion, requires arbitration here, where GS has contracted with the City to receive fees in exchange for services related to the auctioning of the City's municipal securities. GS relies primarily on *Fleet Boston Robertson Stephens, Inc. v. Innovex, Inc.*, 264 F.3d 770 (8th Cir. 2001). In that case, the court rejected the district court's interpretation of "customer" as including any entity other than a broker or dealer. *See id.* at 772 ("We do not believe that the NASD Rules were meant to apply to every sort of financial service an NASD [now FINRA] member might provide, regardless of how remote that service might be from the investing or brokerage activities, which the NASD oversees."). The Court ruled that financial advice alone was insufficient to make a party a "customer" of a National Association of Securities Dealers ("NASD") member. *See id.* at 771 ("[Plaintiff], a multi-service brokerage firm and member of the [NASD], commenced the underlying breach of contract action against AdFlex in an attempt to collect over $800,000 in fees and expenses it claimed it was owed for providing financial advice and assistance to AdFlex . . . . The contract between the parties did not call for [Plaintiff] to act as a broker for AdFlex securities."). Here, as in *UBS*, the FINRA member has provided more than financial advice, but rather has provided services directly related to the securities, i.e., facilitation of auctions of the securities themselves. The Court finds this to be sufficiently related to the broker–dealer function for the City fall under the definition of "customer." The facilitation of an auction of securities directly concerns the transfer of securities and is more than a mere underwriting function. The closer question is whether the alleged wrongdoing in this case is directly related to

the facts that make the City a customer.  Although GS contracted with the City to provide both underwriting and auction facilitation, the alleged wrongdoing in the FINRA arbitration action concerns the underwriting, not the auction facilitation, and the auction facilitation is the only jurisdictional purchase the City has upon the FINRA arbitration requirement. *See UBS Fin. Servs, Inc.*, 660 F.3d at 656–61 (Preska, J., dissenting).  But GS, as a FINRA member, has agreed to FINRA arbitration on the issue of arbitrability itself. *See* FINRA Rule 12203(a) ("The Director may decline to permit the use of the FINRA arbitration forum if the Director determines that, given the purposes of FINRA and the intent of the Code, the subject matter of the dispute is inappropriate . . . .").  FINRA may agree with GS that the claims at issue are not arbitrable because they do not arise out of the auction facilitation, under which the City is a "customer," but rather out of the underwriting, under which it might not be, but this "gateway issue" has been delegated to FINRA. *See Momot v. Mastro*, 652 F.3d 982, 987 (9th Cir. 2011).

      The remaining potentially dispositive issue, which the *UBS* court did not address, is whether the FINRA Rules are inapplicable because only the MSRB Rules apply.  GS argues that MSRB Rule D-9 explicitly excludes an issuer of municipal securities from the definition of customer.  The Court rejects this argument.  In 1997, the Securities Exchange Commission announced that MSRB members would be governed by FINRA (formerly NASD) arbitration rules as if they were FINRA members. *See* S.E.C. Release No. 39378 (December 1, 1997) ("In addition, the proposed rule change requires that bank dealers abide by the NASD's Code just as if they were members of the NASD for purposes of arbitration.").  And even in the absence of that rule change, because GS is a FINRA member, *see* FINRA List of Members - G, http://www.finra.org/AboutFINRA/ MemberFirms/ListOfMembers/P012918, the fact that it is also a MSRB member (under whose rules it apparently need not arbitrate) does not negate its separate requirement to arbitrate under FINRA.  Because Plaintiff is not likely to succeed on the merits, the Court denies the motion for preliminary injunction and will not enjoin the FINRA

action.

## CONCLUSION

IT IS HEREBY ORDERED that the Motion for Preliminary Injunction (ECF No. 7) is DENIED.

IT IS SO ORDERED.

Dated this 26th day of November, 2012.

_____
ROBERT C. JONES
United States District Judge